Appeal No. 16-12313-RGS

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

CHARLES STREET AFRICAN METHODIST EPISCOPAL
CHURCH OF BOSTON,

Debtor – Appellant,

v.

ONEUNITED BANK,

Creditor – Appellee.

On Appeal from the United States Bankruptcy Court for
the District of Massachusetts

_____

**BRIEF OF APPELLANT**

_____

D. Ross Martin (BBO No. 629853)
William L. Roberts (BBO No. 679735)
Joshua E. Goldstein (BBO No. 688250)
Patrick T. Roath (BBO No. 690603)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Tel:  (617) 951-7000
Fax: (617) 951-7050

Counsel to Debtor-Appellant Charles Street AME

## CORPORATE DISCLOSURE STATEMENT

The Charles Street African Methodist Episcopal Church of Boston has no parent corporation.  No entity owns stock in the Charles Street African Methodist Episcopal Church of Boston.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................................... i

JURISDICTIONAL STATEMENT ............................................................................. 1

STATEMENT OF THE ISSUES.............................................................................. 1

STANDARD OF REVIEW ................................................................................... 2

STATEMENT OF THE CASE................................................................................. 3

STATEMENT OF FACTS ................................................................................... 5

      A.      Charles Street and the RRC ................................................................ 5

      B.      Underwriting and Origination.............................................................. 6

      C.      Construction, Extension, Modification ................................................. 8

      D.      Collection Efforts and Attempted Foreclosure ..................................... 8

SUMMARY OF THE ARGUMENT .......................................................................... 9

ARGUMENT................................................................................................ 10

I.      Chapter 93A Prohibits the Origination of Loans that a Borrower is Unlikely to be Able to Repay. ................................................................................................. 10

II.     The Bankruptcy Court's Factual Findings Regarding the Construction Loan Demonstrate that the Loan Failed the Test Established by Fremont and Its Progeny....................................... 13

III.    The Bankruptcy Court Erred by Failing to Clearly Articulate Any Legal Standard, and by Impliedly Applying the Incorrect Standard for Assessing Whether a Loan Would Be Likely to Fail.   .......................................................................................... 15

      A.      The Bankruptcy Court Erred in Misapplying the Principles of Fremont and Its Progeny by Accepting the Lender's Subjective Belief That a Loan Is Likely to Succeed...................................................................... 16

      B.      The Bankruptcy Court Erred by Ignoring Principles of Causation Relevant to Chapter 93A Claims. ....................................................... 23

CONCLUSION............................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Begelfer v. Najarian*,
409 N.E.2d 167 (Mass. 1980) .................................................16

*Casavant v. Norwegian Cruise Line Ltd.*,
952 N.E.2d 908 (Mass. 2011) .................................................23

*Commonwealth v. Fremont Inv. & Loan*,
897 N.E.2d 548 (Mass. 2008) ................................................ passim

*Commonwealth v. H&R Block, Inc.*,
No. 2008-2474BLS1, 2008 Mass. Super. LEXIS 427 (Mass. Super. Ct. Nov. 25,
2008) (Gants, J.)...............................................12, 13, 14, 15

*Darviris v. Petros*,
795 N.E.2d 1196 (Mass. App. Ct. 2003), *aff'd*, 812 N.E.2d 1188 (Mass. 2004) .............11, 12

*Drakopoulos v. U.S. Bank Nat'l Ass'n*,
991 N.E.2d 1086 (Mass. 2013) ................................................ passim

*Fazio v. Bank of Am., NA*,
No. 1001255, 2010 WL 2432024 (Mass. Super. Ct. May 13, 2010) ......................................12

*Ferreira v. Sterling Jewelers, Inc.*,
130 F. Supp. 3d 471, 484-85 (D. Mass. 2015).........................................25, 26, 27

*Frappier v. Countrywide Home Loans, Inc.*,
645 F.3d 51 (1st Cir. 2011)................................................10, 12, 20, 21

*Gath v. M/A-Com, Inc.*,
802 N.E.2d 521 (Mass. 2003) ................................................11

*Haemonetics Corp. v. Dupre*,
238 B.R. 224 (D. Mass. 1999), *aff'd sub nom. Haemonetics Corp. v. Dupre (In re
Dupre)*, 229 F.3d 1133 (1st Cir. 2000) ......................................................2

*Harbor Houses Condominium Ass'n v. IDC Clambakes, Inc. (In re IDC Clambakes, Inc.)*,
727 F.3d 58 (1st Cir. 2013)......................................................2

*Jones v. Jones Bros. Constr. Corp.*,
888 F.2d 1215 (7th Cir. 1989) (per curiam).........................................17

*Levings v. Forbes & Wallace, Inc.*,
396 N.E.2d 149 (Mass. App. Ct. 1979) ...............................................11

*Moronta v. Nationstar Mortg., LLC*,
  41 N.E.3d 311, 316 (Mass. App. Ct. 2015), *rev'd on other grounds* 64 N.E.3d 1287
  (Mass. 2016) ................................................................................................................20

*OneUnited Bank v. Charles Street African Methodist Episcopal Church of Boston*,
  2012-J-0049 (Mass. App. Ct. Feb. 27, 2012)....................................................3, 4, 8

*OneUnited Bank v. Charles Street African Methodist Episcopal Church*,
  SUCV2010-03506, Docket No. 1 (Mass. Super. Sept. 2, 2010)................................3

*Purity Supreme, Inc. v. Attorney General*,
  407 N.E.2d 297 (Mass. 1980) ................................................................................11

*Silva v. OneWest Bank, FSB*,
  No. 1001681, 2010 WL 2432046 (Mass. Super. May 19, 2010)...........................21

*Smith v. Jenkins*,
  732 F.3d 51 (1st Cir. 2013) ....................................................................................25

*Wellness Int'l Network, Ltd. v. Sharif*,
  135 S. Ct. 1932 (2015) .............................................................................................1

## STATUTES

28 U.S.C. § 158(a) .............................................................................................................1

28 U.S.C. § 1334(b) ..........................................................................................................1

Mass. Gen. Laws ch. 93A ........................................................................................ passim

Mass. Gen. Laws ch. 93A, § 2(a)...................................................................................10

## JURISDICTIONAL STATEMENT

The proceeding below involved an objection to Appellee OneUnited Bank's ("OneUnited," or the "Bank") proof of claim filed in Appellant Charles Street African Methodist Episcopal Church of Boston's (the "Church," or "Charles Street") bankruptcy case, and two counterclaims. The bankruptcy court had jurisdiction pursuant to 28 U.S.C. § 1334(b). Both parties agreed that this was a non-core matter. The bankruptcy court concluded that it could enter final judgment in favor of Appellee. Appellant consents to that entry of final judgment. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1940 (2015). This Court has jurisdiction to hear this appeal from that final judgment pursuant to 28 U.S.C. § 158(a).

This appeal is from the bankruptcy court's decision resolving one of the two causes of action addressed by its Judgment on Objection to Proof of Claim and Counterclaim, Adv. No. 14-01138, Docket No. 383, (hereinafter, "B. Adv. Dkt."), and the attendant Memorandum of Decision on Objection to Proof of Claim and Counterclaim, Adv. No. 14-01138, Docket No. 382, ("Ex. 1"),[1] each entered on November 2, 2016. On November 16, 2016, the Church filed two timely notices of appeal: one in the Bankruptcy Case (No. 12-12292, Docket No. 908, hereinafter, "Ch. 11 Dkt."), and one in the Adversary Proceeding (Adv. No. 14-01138, Docket No. 388). The appeals have been consolidated in this Court. *See* Dkt. No. 9.

## STATEMENT OF THE ISSUES

1.      Whether the bankruptcy court applied the proper standard for assessing liability for unfair conduct in wrongful loan origination under Section 9 of Chapter 93A when the loan at issue was made to a nonprofit organization (such as a church) not engaged in trade or commerce.

---

[1] All references to "Ex. __" refer to documents in the enclosed Appendix of Exhibits. Although this brief does not directly reference to each exhibit in the appendix, the additional exhibits are part of the record on appeal and discussed in the bankruptcy court's opinion, and are thus enclosed for the convenience of the Court.

1

2.      Whether, in a case such as this, a lender's subjective belief that a loan is likely to succeed is sufficient to preclude liability when the lender recklessly disregards significant risk factors and fails to conduct meaningful diligence on factors "essential" to the lender's decision to approve the loan.

3.      Whether the bankruptcy court's apparent determination that (a) a relative asymmetry of information between lender and borrower regarding the borrower's ability to raise money to repay the loan, (b) unforeseen but reasonably foreseeable contingencies that emerged post-origination and contributed to the loan's failure, or (c) a guarantor's failure to rescue the loan, can foreclose liability for wrongful origination, either as a matter of general principles of causation or as an element of the claim's prima facie case.

## STANDARD OF REVIEW

Charles Street is not seeking to re-try its case in this Court and does not challenge the bankruptcy court's post-trial factual findings.  The bankruptcy court's opinion, however, does not cite a single reasoned opinion regarding the merits questions that it resolved.  Two types of error arise from this blank slate left by the trial court.

First, the bankruptcy court reached its decision in reliance on incorrect legal standards. The district court reviews these legal conclusions de novo.  *See Harbor Houses Condominium Ass'n v. IDC Clambakes, Inc. (In re IDC Clambakes, Inc.)*, 727 F.3d 58, 63 (1st Cir. 2013).

A second category of errors at issue include instances of "a trial court bas[ing] its findings upon a mistaken impression of applicable legal principles" where "the reviewing court is not bound by the clearly erroneous standard."  *Haemonetics Corp. v. Dupre*, 238 B.R. 224, 228 (D. Mass. 1999), *aff'd sub nom. Haemonetics Corp. v. Dupre (In re Dupre)*, 229 F.3d 1133 (1st Cir. 2000) (quoting *Williams v. Poulos*, 11 F.3d 271, 278 & n.11 (1st Cir. 1993)).  These mixed questions of fact and law invoke "a sliding standard of review," with predominantly legal

questions falling closer to de novo review on the "degree of deference continuum."  *See In re IDC Clambakes*, 727 F.3d at 64 (quoting *Braunstein v. McCabe*, 571 F.3d 108, 124 (1st Cir. 2009)).

## STATEMENT OF THE CASE

This case involves Charles Street African Methodist Episcopal Church of Boston, one of the earliest congregations of the AME denomination and incorporated by special act of the Massachusetts Legislature in 1839, and OneUnited Bank, a Boston-headquartered African-American-owned bank, but with most of its lending operations in Los Angeles.

This case arose in bankruptcy court because Charles Street commenced a Chapter 11 proceeding in 2012 after the Bank posted the Church building for foreclosure and had a "no negotiation" strategy with Charles Street.  Ch. 11 Dkt. No. 9; Ex. 1 ¶ 217.  The litigation at issue in this appeal began in 2010 in Massachusetts state court when OneUnited filed a civil action to collect a separate loan made to the Church regarding a proposed community center.  Complaint, *OneUnited Bank v. Charles Street African Methodist Episcopal Church*, SUCV2010-03506, Docket No. 1 (Mass. Super. Sept. 2, 2010).   The Church brought a counterclaim under Massachusetts General Laws Chapter 93A, alleging that the community-center loan had been wrongfully originated in a manner held actionable in *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548 (Mass. 2008).  The Superior Court dismissed that counterclaim, without opinion, at the beginning of 2012.  Docket Order Jan. 5, 2012, *OneUnited Bank v. Charles Street African Methodist Episcopal Church*, SUCV2010-03506.

However, on discretionary, interlocutory review, just after the foreclosure notice on the Church building in February 2012, a single Justice of the Massachusetts Appeals Court (Agnes, J.) reversed and reinstated the Church's Chapter 93A claim, observing that "the allegations of the counter-claim . . . are certainly as egregious as those involved in *Fremont*."  Memorandum and

Order at 3, *OneUnited Bank v. Charles Street African Methodist Episcopal Church of Boston*, 2012-J-0049 (Mass. App. Ct. Feb. 27, 2012). The Chapter 11 case commenced soon thereafter, on March 20, 2012, and the state-court litigation was held in abeyance.

The course of the Chapter 11 proceeding is relevant primarily to explain the time period that has passed. Charles Street proposed a reorganization plan that would pay the Bank in full, though over a long period of time, at an interest rate to be approved by the bankruptcy court. Ch. 11 Dkt. No. 667. The Bank objected to that full-payment restructuring. In October 2013, the bankruptcy court denied approval of the plan, but only because it was concerned that the Church would not be able to make the required payments over time. *Id.* The bankruptcy court suggested that the Church propose a new restructuring plan with payments reduced to the value of the Bank's mortgages. *Id.* It also sanctioned the Bank on two occasions for conduct during that process. Ch. 11 Dkt. Nos. 333, 668. The Church then had a highly successful auction sale of three of its six properties in 2014. The bankruptcy court (a) ordered that the sale proceeds be held in escrow because the Church had as substantial likelihood of success on its Chapter 93A claims against the Bank and (b) directed the parties to litigate those claims before a further reorganization plan was proposed.

OneUnited filed a proof of claim in the bankruptcy proceeding on June 1, 2012, concerning two separate loans. Ex. 1 at 2. The adversary proceeding here is a consolidated proceeding of two affirmative Chapter 93A causes of action and a claims objection that would simply allow the Church to setoff against amounts it owes the Bank to the extent of its damages. *Id.* ¶ 3. Those causes of action were for (1) wrongful underwriting of one loan and (2) unfair and deceptive use of collection action and foreclosure process of the other loan. *Id.* ¶ 4. At the close of discovery, the bankruptcy court ruled in favor of the Church's opposition to the Bank's

extensive summary judgment motion. B. Adv. Dkt. No. 217. After trial, the bankruptcy court ruled for the Bank on both Chapter 93A claims. B. Adv. Dkt. No. 383. Charles Street now appeals the wrongful origination claim.

## STATEMENT OF FACTS

### A.    Charles Street and the RRC

Charles Street is an historic African-American church serving the Roxbury, Dorchester, and Mattapan communities of Boston. Ex. 1 ¶ 1. The Church is one of the 330 churches in the African Methodist Episcopal Church's First Episcopal District (the "District" or the "First District"). *Id.* ¶ 2. Community service animates the African Methodist Episcopal Church as a whole and especially Charles Street. *Id.* ¶¶ 5, 6. To fulfill this mission, Charles Street operates numerous community-oriented programs, which primarily serve individuals who are not church members. *Id.* ¶ 6.

As early as 1999, the Church desired to build a community center adjacent to the Church, to be known as the Roxbury Renaissance Center (the "RRC"). The RRC would have been a new platform for Charles Street to serve its community by providing a space for current services and by allowing the Church to expand its services. Ex. 1 ¶¶ 7, 9. The Church acquired a vacant building known as the Sky-Cap Building at 575 Warren Street in April 1999 for this purpose. *Id.* ¶ 8. It raised the necessary funding through internal fundraising, making its own down payment. *Id.* ¶ 8. The Church commenced an ambitious fundraising campaign to afford the renovation project called "Vision to Victory" or "V2V" with the goal of raising $2 million dollars over three to four years. *Id.* ¶ 10. However, for some time the Church was unable to borrow the significant additional funds necessary to renovate.

### B.   Underwriting and Origination

In early 2005, an official in the City of Boston's Department of Neighborhood Development met with the Church about financing options for the RRC and subsequently connected the Church with OneUnited.  *Id.* ¶ 20.  Beginning 2005 and ending in 2006, OneUnited Bank underwrote and made two loans to Charles Street.  The first, a $1 million "Church Loan" that refinanced preexisting debt of Charles Street, is not the subject of this appeal. *Id.* ¶¶ 109, 123.  The second loan of $3.6 million was for construction of the RRC (the "Construction Loan").  *Id.*  ¶¶ 28, 52.  The First District served as the guarantor for the Construction Loan.  *Id.* ¶ 29.

At that time, OneUnited was planning to open a branch in Grove Hall, and "the Bank's business-development strategy included targeting of minority churches in low-to-moderate income neighborhoods, to develop deposits from the churches and their congregants and lending relationships with the churches."  *See id.* ¶ 25.  Over the next year, representatives from the Bank and the Church discussed the amount and terms of a loan financing the construction of the RRC (the "Construction Loan").  And, in the summer of 2007, OneUnited held a special grand opening event for its Grove Hall branch at the Church.  *See id.* ¶ 140.  The Bank's CEO addressed the congregation from the pulpit and, after a reception, members of the Church and Bank officials walked to the Bank, where a number of parishioners opened accounts.  *Id.*

The Bank's Construction Loan underwriting and origination process was significantly flawed, departing from ordinary commercial practices and regulatory guidance in nearly every respect.  The bankruptcy court found that the evidence adduced at trial demonstrated the Bank's acknowledgement and awareness of the significant issues with the Construction Loan.  Specifically, the bankruptcy court made the following findings regarding the primary weaknesses of the Construction Loan and the Bank's knowledge of those weaknesses:

- Debt Service Coverage.  The Bank's own underwriting memorandum noted that "[t]he Church does not have adequate cash flow to service this debt at the qualifying or start rate." *Id.* ¶ 58.  This was seen by the lead underwriter, and the only contradictory analysis was the result of a flagrant math error and was made with "no justification." *Id.* ¶ 65.

- Church Liquidity.  "The Bank's evaluation of liquidity was limited to asking whether the Church's liquid assets were at least three times monthly debt service.  The fact that the Church would need to raise at least $1.3 million dollars to complete the RRC did not factor into this particular analysis." *Id.* ¶ 73.

- Fund-Raising Ability.  "The Bank and its decision makers were well aware" of the need for four separate kinds of additional funds in order for the Church to be able to afford to pay the Construction Loan, totaling millions of dollars. *Id.* ¶ 77.  This issue "did not elude Bank underwriter Tom Jones, who . . . noted up front that the Construction Loan was 'anchored on the receipt of unprecedented lease and rental income, gifts, grants and campaign contribution [sic].'" *Id.* ¶ 81.

- Potential Rents to Pay the Construction Loan.  The Bank's underwriting relied on "post-construction cash flows based on new revenues from the renovated facility," and the bankruptcy court stated that "[t]he projections supplied by CSAME/RRC show that these would commence only in the second year of occupancy, which would be at least the second year after maturity of the construction loan." *Id.* ¶ 82.

- Adequacy of Collateral.  The Bank's own underwriting approval memo stated: "The Appraisal "As Complete" results in a LTV of 96% which significantly exceeds OUB's maximum policy." *Id.* ¶ 84.  The memo then adjusted this by including the $850,000 deposit (mentioned above), but that adjustment "was largely window dressing . . . it improved the loan's LTV ratio but in fact served no true collateral purpose." *Id.* ¶ 85.

- Guaranty.  The Bank considered the guaranty "as a mitigating factor for inadequacies in debt service coverage, liquidity, and loan-to-value ratio." *Id.* ¶ 91.  Indeed, the bankruptcy court found that "the Bank approved a loan that, but for the guaranty it would not have approved." *Id.* ¶ 93.  The Bank formed its opinion of the District's financial strength on the basis of two financial statements provided by the District. *Id.* ¶ 87.  Despite the Bank's heavy reliance on the guaranty and the District's financial statements, "no one at the bank undertook to verify" the financial statements. *Id.* ¶ 92.

The Bank ultimately approved the Construction Loan sometime in May 2006 and issued a commitment letter to the Church on June 6, 2006, which the Church accepted on June 13, 2006. *Id.* ¶¶ 37, 107–08.  In June 2006, Charles Street and OneUnited began discussions regarding the Church Loan. *Id.* ¶¶ 109, 118–19.  Charles Street and OneUnited closed on both loans on October 3, 2006. *Id.* ¶ 122.

### C.   Construction, Extension, Modification

From the beginning of construction in November 2006, the RRC project "ran into delays and overruns." *Id.* ¶ 135. Before the end of 2007, the Charles Street/RRC board of directors was informed of financial issues that "threatened the ability of the Project to be completed before the expiration of the Construction Loan." *Id.* ¶ 141. And, "[b]y the end of January 2008, anxiety about Project funding had spread to OneUnited." *Id.* ¶ 142.

The Church exercised its contractual options to extend the Construction Loan twice, ultimately pushing the maturity date of the Construction Loan to December 1, 2008. *Id.* ¶ 148, 152. As the December 1, 2008 maturity date approached and the RRC was far from complete, the Church and Bank entered into the first modification of the Construction Loan. *Id.* ¶ 157. Two more modifications followed. *Id.* ¶¶ 165, 172. OneUnited conditioned each extension and modification on the payment of a fee, in the end totaling at least $37,542.32 (the amount of the second modification fee is not clear). *Id.* ¶¶ 148, 152, 157, 165, 172. On December 1, 2009, the Construction Loan reached the maturity date set by the third modification, and the RRC was not ready for occupancy. *Id.* ¶ 177. At that time, "the [Construction] loan became due and payable in full, and the Church did not pay it." *Id.* ¶ 178.

### D.   Collection Efforts and Attempted Foreclosure

The Bank pursued collection of the Construction Loan by suing the Church and the First District in the Massachusetts Superior Court. *Id.* ¶ 198. The Church brought counterclaims, including principally the same counterclaim that is at issue on this appeal. *Id.* ¶ 199. When the Superior Court dismissed that counterclaim, the Appeals Court reinstated it, saying "the conduct alleged was, if anything, more egregious than in *Freemont* [sic]." Memorandum and Order at 3, *OneUnited Bank v. Charles Street African Methodist Episcopal Church of Boston*, 2012-J-0049

(Mass. App. Ct. Feb. 27, 2012); Ex. 1 ¶¶ 209, 213.  Bankruptcy ensued, and the action below proceeded to a bench trial in bankruptcy court.

## SUMMARY OF THE ARGUMENT

The Supreme Judicial Court has held that Chapter 93A, Section 9 of the Massachusetts General Laws, makes it improper for a lender to originate a loan that a borrower is "unlikely to be able to repay." *Drakopoulos v. U.S. Bank Nat'l Ass'n*, 991 N.E.2d 1086, 1099 (Mass. 2013); *see also Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 559-60 (Mass. 2008).  At a six-day trial in October 2015, Charles Street's burden was to prove, by a preponderance of the evidence, that OneUnited Bank "should have recognized at the outset" that Charles Street would likely be unable to repay the Construction Loan.  *Drakopoulos*, 991 N.E.2d at 1095-96.  A year later, the bankruptcy court issued an order denying the Church's objection to a proof of claim.  In a 102-page opinion, the bankruptcy court cited a total of three cases, none of which related to the substance of the causes of action.

In lieu of traditional legal analysis, the bankruptcy court made a series of extensive factual findings and then arrived, in summary fashion, at a sudden legal conclusion.  The bankruptcy court ultimately ruled that the counterclaim failed because officers of the Bank held the subjective belief that the Construction Loan would be repaid, and that the loan's failure was caused by the Church's inability to meet its fundraising projections, the guarantor's failure to rescue the loan, and certain unforeseen contingencies, including construction overages.  *See* Ex. 1 ¶¶ 102, 232, 233, 234.  Each cause of failure identified by the bankruptcy court was identified by the Bank during the underwriting of the Construction Loan.

By resolving the adversary proceeding in this manner, the bankruptcy court departed from—without discussion of or even reference to—the core principles that govern wrongful loan origination claims in the residential mortgage context and apply with equal force to loans made

to nonprofit organizations not engaged in trade or commerce.  Instead, without announcement or analysis, the bankruptcy court resolved the key threshold issues posed by this case and (apparently) invented a new standard that turns on the lender's subjective beliefs at the time of origination and objectively foreseeable events that occur after the loan is offered.  Compounding those legal errors, the bankruptcy court went on to determine that the Church had not proven its wrongful loan origination claim despite finding facts clearly sufficient to prove such a claim under the standards established by Massachusetts courts.[2]

## ARGUMENT

### I.   Chapter 93A Prohibits the Origination of Loans that a Borrower is Unlikely to be Able to Repay.

The Massachusetts Supreme Judicial Court ("SJC") held in the seminal case of *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548 (Mass. 2008), that it is unlawful under Chapter 93A, Section 9 to underwrite and make a "loan that the lender should recognize at the outset the borrower is not likely to be able to repay."  *Fremont*, 897 N.E.2d at 559–60.  Building on that holding, subsequent decisions have reinforced the straightforward, common-sense notion that it is illegal for a commercial lender to originate a loan that is "doomed to foreclosure," *Drakopoulos*, 991 N.E.2d at 1096, or offer a loan a borrower is "unlikely to be able to repay," *id.* at 1095; *see also Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51, 56 (1st Cir. 2011).

Chapter 93A renders unlawful the use of any "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2(a).  As the SJC has observed, "the remedy provided by [Chapter 93A] is 'sui generis . . . neither wholly tortious nor wholly

---

[2] Charles Street contemporaneously moves to certify to the Massachusetts Supreme Judicial Court the dispositive legal questions of state law at issue in this appeal.  *See* Charles Street's Motion for Order Certifying Questions of Law to the Massachusetts Supreme Judicial Court. These questions are novel but far from unique, and are likely to arise again when a sophisticated lender with an ulterior motive seeks to leverage a vulnerable borrower for its own purposes.  *See id.*

contractual in nature.'" *Gath v. M/A-Com, Inc.*, 802 N.E.2d 521, 534 (Mass. 2003) (quoting *Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768, 779 (Mass. 1975)).   The key phrase "unfair or deceptive acts" is not defined by the statute.   Instead, these terms are "open-ended," *Purity Supreme, Inc. v. Attorney General*, 407 N.E.2d 297, 303 (Mass. 1980), and derive their meaning through regulations promulgated by the attorney general and the decisions of Massachusetts courts.   "It is impossible to frame definitions which embrace all unfair practices.   There is no limit to human inventiveness in this field." *Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979) (internal quotations omitted).   Accordingly, claims under Chapter 93A are evaluated on an all "facts and circumstances" basis.   *Darviris v. Petros*, 795 N.E.2d 1196, 1200 (Mass. App. Ct. 2003), *aff'd*, 812 N.E.2d 1188 (Mass. 2004).

In keeping with these basic Chapter 93A principles, in *Fremont* the SJC established a non-exhaustive list of objective indicia that courts are to use to determine whether, at the time of origination, a borrower was unlikely to be able to repay a loan.   These are characteristics of loans that in some "combination" indicate that "the borrower would not be able to make the necessary loan payments, leading to default and then foreclosure." *Fremont*, 897 N.E.2d at 551. Specifically, the SJC identified as "presumptively unfair" loans that feature: (1) an adjustable rate mortgage with a short-term (three years or less) introductory rate period; (2) an introductory rate well below (at least three percent) the fully indexed rate; (3) a debt-to-income ratio exceeding fifty percent as measured using the mortgage payment due under the fully indexed rate (rather than the introductory rate); and (4) a loan-to-value ratio of one hundred percent or a substantial prepayment penalty. *Id*. at 554.   The presence of the first three characteristics— essentially, ballooning interest payments owed by a borrower who could not service the debt— indicated the loan was likely "doomed to foreclosure" unless the borrower could re-finance the

loan; the fourth suggested that re-financing the loan would be possible only if the property's value increased.  *Id.* at 554–55.  This loan structure amounts to a "heads I win, tails you lose" proposition: these are loans that are unlikely to work out, with consequences far more calamitous to borrower than lender.  As the author of the original trial court opinion in *Fremont* put it, the "prohibited unfair conduct" at the heart of these cases is "the issuance of home mortgage loans with reckless disregard of the risk of foreclosure."  *Commonwealth v. H&R Block, Inc.*, No. 2008-2474BLS1, 2008 Mass. Super. LEXIS 427, at *10 (Mass. Super. Ct. Nov. 25, 2008) (Gants, J.).

The *Fremont* factors do not constitute an exclusive list and liability is not limited to loans with these specific terms.  *Drakopoulos*, 991 N.E.2d at 1095.  Because Chapter 93A claims apply an all facts and circumstances test, *Darviris*, 795 N.E.2d at 1200, Massachusetts courts have emphasized that a loan with a "combination of independently legal terms may [be] . . . unfair under Chapter 93A if the combination constitutes an unsound lending practice and in essence dooms the borrower to foreclosure."  *Fazio v. Bank of Am., NA*, No. 1001255, 2010 WL 2432024, at *3 (Mass. Super. Ct. May 13, 2010) (citing *Fremont*, 897 N.E.2d at 556).  These factors "simply suggest reckless disregard; they do not require such a finding, especially if the lender introduces other evidence demonstrating that its issuance of the loan was reasoned, for instance, because of the availability or expectation of other assets."  *H&R Block*, 2008 Mass. Super. LEXIS 427, at *19.  This balancing approach has been the lodestar for Massachusetts courts—and federal courts interpreting Massachusetts law—applying Chapter 93A to claims of wrongful loan origination at various stages of litigation.  The bankruptcy court did not cite or discuss a single one of the preceding, bedrock cases: not *Fremont*, not *Drakopolous*, and not even the First Circuit's *Frappier*.

**II.      The Bankruptcy Court's Factual Findings Regarding the Construction Loan Demonstrate that the Loan Failed the Test Established by *Fremont* and Its Progeny.**

At trial, Charles Street advanced a case squarely governed by these principles.  As the bankruptcy court's factual findings demonstrate, the Construction Loan originated by the Bank was structurally unsound and primed for failure, supported only by cursory diligence and the flimsiest documentation.  Several key findings made by the bankruptcy court align closely with the criteria established by *Fremont* and amplified by later decisions:

- The interest rate on the Construction Loan ballooned.  *See* Ex. 1 ¶ 126 ("The interest rate was fixed at 8.00 percent for the first six months and thereafter would float with the prime rate, subject to a floor of 7 percent and a cap of 14 percent."); *see also Fremont*, 897 N.E.2d at 554–55 (first *Fremont* factor).

- The Construction Loan had a high debt service coverage ratio.  *See* Ex. 1 ¶ 58.  The Bank's analysis of the debt service coverage ratio relied upon faulty calculations regarding interest payment obligations that essentially double-counted interest, *id.* ¶ 65; "unprecedented" fundraising and rental income from the RRC, the latter of which would not begin to be generated until "at least the second year after maturity of the construction loan," *id.* ¶¶ 81–82; and taking rental projections "at face value."  *Id.* ¶ 92; *see also Fremont*, 897 N.E.2d at 554–55 (third *Fremont* factor).

- OneUnited was aware that the Construction Loan had a dangerously high loan-to-value ratio—of 369% as is and 96% as complete—that was propped up by an inaccurate appraisal of the RRC and the use of restricted funds.  *See* Ex. 1 ¶¶ 39, 40, 53, 58, 83, 85; *see also Fremont*, 897 N.E.2d at 554–55 (fourth *Fremont* factor).

- The Construction Loan was structurally unsound.  While the projections used in the Bank's underwriting process relied on the RRC being completed and generating income, *see* Ex. 1 ¶ 70, "success" within the meaning of the Construction Loan only contemplated "obtain[ing] a certificate of occupancy," *id.* ¶ 94.  And the Bank refused to commit to providing a take-out loan after the pre-paid interest period ended and the balloon payment came due.  *Id.* ¶ 132.

- Finally, the Bank's underwriting practices blatantly ignored strongly worded guidance from its own state and federal regulators to adjust its loan-making procedures, *see Id.* ¶¶ 84, 99.

Certainly in *Fremont*-type claims the lender can "introduce[] other evidence demonstrating that its issuance of the loan *was reasoned*."  *H&R Block*, 2008 Mass. Super. LEXIS 427, at *19 (emphasis added).  And so the Bank did here, raising supposed "mitigating factors" for the "weakness[es]" of the Construction Loan.  Ex. 1 ¶ 64.  The bankruptcy court's findings are clear that ultimately the Bank made the Construction Loan almost solely on the

strength of the mitigating factors of an $850,000 deposit and a guaranty from the First District:

"The Bank's decision makers relied heavily on the guaranty [from the First District], and what

they believed was the financial strength of the guarantor, to mitigate concerns about the Church's

cash flow and ability to service the debt that would arise from the Construction Loan." *Id.* ¶ 71.

The bankruptcy court made specific findings that the use of the $850,000 deposit in the

underwriting was improper, and thus not reasoned, referring to the deposit as mere "window

dressing." *Id.* ¶ 85. As for the guaranty, without which, the bankruptcy court found, "the Bank

as an organization, would not have approved the loan," the bankruptcy court made express

findings that the Bank failed to conduct any meaningful review of the District's financials. *Id.* ¶

93. According to the bankruptcy court, the Bank relied upon "reviewed," not audited, financial

statements provided by the District. *Id.* ¶¶ 87–89. But despite the Bank's heavy reliance "on

the District's financial statements, … no one at the Bank undertook to verify them. The Bank

accepted them at face value." *Id.* ¶ 92. All told, the bankruptcy court found that "the Bank did

not exercise the diligence that a reasonable person would have exercised in investigating the

guarantor and its role in the Project (among other things)." *Id.* ¶ 102.

As the bankruptcy court's factual findings demonstrate, this was a structurally unsound

loan that was primed for failure and supported only by cursory diligence. Other findings made

by the bankruptcy court explain why the Bank could be motivated, at least in part, to make such

a loan, such as the Bank's desire to seek out new costumers and new deposits in the

neighborhood it was expanding into. On this point, the bankruptcy court found that "[t]he Bank

viewed its relationship with Charles Street as an important complement to the [its new branch in

Roxbury]," and approved the loan hoping that it "would establish a high-profile relationship that

would create good will and thereby help the Bank in its effort to open a branch in Grove Hall and

to develop deposits and loans in the area." *Id.* ¶ 104.  So motivated, the Bank originated a loan that a borrower was not likely to be able to pay and was "doomed" to fail, *Drakopoulos*, 991 N.E.2d at 1096, acting "with reckless disregard of the risk of foreclosure," *H&R Block*, 2008 Mass. Super. LEXIS 427, at *10.

III.    **The Bankruptcy Court Erred by Failing to Clearly Articulate Any Legal Standard, and by Impliedly Applying the Incorrect Standard for Assessing Whether a Loan Would Be Likely to Fail.**

The bankruptcy court's order sidesteps *Fremont* and its progeny altogether by making a lengthy series of findings followed by a summary conclusion devoid of any legal analysis of the underlying claims, ultimately ruling that because "[w]hen it made the loan, the Bank did not know the loan would fail," nor was it "evident" that the loan would fail, the Church could not "carry its burden" of showing that the Bank committed an unfair act in violation of Chapter 93A, Section 9.  The bankruptcy court then determined that it "*need not address* the issue of whether the Supreme Judicial Court would extend the holdings on which the Church relies to non-consumer, non-residential construction loans." Ex. 1 at 101 (emphasis supplied).

By resolving the adversary proceeding in this manner, the bankruptcy court has thus *implicitly decided* the threshold legal issues posed by this case.  *Fremont*, and the cases that follow it, all involve loans made to individuals for the purpose of buying a home.  No court has yet applied the principles of *Fremont* to a situation such as this one, involving a nonprofit religious institution, a guaranty provided by another entity within that institution (and relied on by the Bank for exactly that reason), seeking a loan from a sophisticated lender and, in this narrow sense, the Church's claim presented a legal novelty. [3]  As a matter of simple logic, the

---

[3] While the *Fremont* factors have not been applied beyond residential mortgages, the Church, as a non-profit with a charitable mission and no sophisticated financial officer, is also a Section 9 entity, just like a residential borrower.  Chapter 93A claims are governed by Section 9 by default. *See* Mass. Gen. Laws ch. 93A, § 9.  Conduct is subject to Section 11 only if the activity was a

bankruptcy court could not have avoided deciding the question of whether the Church could bring such a claim under Chapter 93A, Section 9, unless the bankruptcy court first assumed a *Fremont*-type claim could be made. The bankruptcy court would have to elucidate the proper legal standard for such a claim, and then find facts under which the Bank would have prevailed anyway. Instead, the bankruptcy court's logic assumes that the standard for a wrongful origination claim *is* the factual finding that the bankruptcy court made: (i) that there can be no liability so long as the lender did not *subjectively* intend to make a doomed-to-fail loan *and* (ii) that the foreseeable consequences of a risky loan were not *actually* anticipated by the lender. These two premises are legal errors which infect the bankruptcy court's ruling and require reversal.

Charles Street argues now, as it did at trial, that the principles articulated in *Fremont* apply in the context of Section 9 plaintiffs, on an all facts-and-circumstances basis. The facts found by the bankruptcy court prove the Church's case by a preponderance of the evidence. And, as discussed further below, the bankruptcy court's factual findings demonstrate that this loan has every factor set forth in *Fremont* plus more: a no-diligence guaranty and "window dressing" reliance on restricted charitable funds as collateral.

> **A.** **The Bankruptcy Court Erred in Misapplying the Principles of *Fremont* and Its Progeny by Accepting the Lender's Subjective Belief That a Loan Is Likely to Succeed.**

A case with a "unique fact pattern" requires that the trial court provide "a more comprehensive and complete explanation of the factual and legal issues, so that the appellate court is not asked by both sides to read between the lines to find what is 'impliedly resolved.'"

---

commercial transaction and plaintiff and defendant were "engage[d] in the conduct of any trade or commerce." *Id.* § 11. Whether a party was engaged in trade or commerce is a fact-specific inquiry guided by several factors: "the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties, [and] whether the transaction is motivated by business or personal reasons." *Begelfer v. Najarian*, 409 N.E.2d 167, 176 (Mass. 1980).

*See, e.g.*, *Jones v. Jones Bros. Constr. Corp.*, 888 F.2d 1215, 1216–17 (7th Cir. 1989) (per curiam).  Even more concerning than the absence of reasoned analysis is the radical departure the bankruptcy court's order takes from the legal framework established by *Fremont* and reinforced by the cases that follow.  If left standing, the bankruptcy court's order threatens to convert the objective, all-facts-and-circumstances assessment used by Massachusetts courts to assess unfairness and recklessness in lending practice into a test likely to devolve into an attempt to gauge pure subjective intent.  This would allow defendants to plead that "they did not intend for the loan to fail," leave the fact-finder to plum the virtuousness of the lender's subjective intentions, and, most importantly, undercut the clear intent of the SJC in *Fremont* to prevent lenders from arguing "I was just doing what everyone else was."  *Fremont*, 897 N.E.2d at 561-62 (rejecting an argument that liability could not be imposed on "lending practices that were considered permissible and acceptable when the loans were made").  Simply put, if a lender's subjective intent that a loan not fail is sufficient to defeat a wrongful loan origination claim, then the *Fremont* doctrine will all but cease to exist.

Indeed, there is a dramatic contrast between (a) the bankruptcy court's detailed findings regarding the Bank's underwriting and origination process, all of which make direct rulings as to the Bank's actual knowledge and complete lack of diligence on certain items; and (b) the bankruptcy court's ultimate reliance on in-court statements made by bank officials about their subjective belief.

The bankruptcy court arrived at the perfunctory conclusion that decision makers at the bank "testified credibly that they believed the loan would succeed."  Ex. 1 ¶ 95.  But as detailed above, *see supra* Statement of Facts, Part B, the bankruptcy court found that the Bank considered

at least six serious weaknesses of the loan indicating that the Church was unlikely to be able to

repay the Construction Loan.  Much was summarized by just one of the many express findings:

> The loan did not meet the Bank's lending standards in several ways: debt service
> coverage, liquidity, and loan-to-value ratio were all inadequate by the Bank's
> internal standards; the Bank's analyses of these were seriously flawed; and the
> Bank did not adequately investigate whether the District could bear the weight of
> reliance that the Bank was placing on it.

*Id.* ¶ 105.  Despite the bankruptcy court's finding that it was "remarkable that the Bank did not

examine the District and its finances more closely," *id.* ¶ 99, the bankruptcy court held that

because "that the Bank did truly believe that the District was so financially strong and committed

as to warrant the considerable faith that the Bank placed in it," this sincerely-held, even if

objectively unreasonable, "belief" somehow foreclosed liability.  Ultimately, the bankruptcy

court ruled:

> Notwithstanding these deficiencies in the loan and in the underwriting process,
> the Bank sincerely believed that the Construction Loan would likely succeed.
> Given the District's backing and the limited amount of the loan and of the
> construction it was designed to fund, the Bank believed that the risk of default
> was well within tolerable bounds and that the loan warranted approval.  Whether
> or not there was error and perhaps some unwitting self-deception in reaching this
> conclusion, the Bank honestly believed the loan would succeed.

*Id.* ¶ 105.

The bankruptcy court's willingness to elevate a defendant's subjective goodwill over the

weight of probative, objective evidence proving a reckless departure from ordinary business

standards is in direct conflict with *Fremont*, its progeny, and basic principles of Chapter 93A

liability.  *See* 52 Mass. Prac. Series, Law of Chapter 93A, § 4.9. General standard—Unfair—§ 9

standard—Equity (2015) ("Massachusetts case law has . . . moved away from subjective and

moralistic tests of unfairness and toward more objective standards.").  *Fremont* and the cases in

its wake plainly define "unfair . . . conduct" by reference to a set of objective criteria.  "What is

significant," the SJC has held on this point, "is the particular circumstances and context in which the term ['unfairness'] is applied." *Fremont*, 897 N.E.2d at 556.

The cases applying *Fremont* are instructive. In *Drakopoulos*, the SJC overturned the entry of summary judgment in favor of the lending bank on the basis of the lower court's "unduly narrow" view of the kind of lending practices forbidden by Chapter 93A. 991 N.E.2d at 1095. The lender won at summary judgment by pointing out that the loan it had offered had three, but not all four, of the characteristics identified in *Fremont* as inhering to an unfair loan. *Id.* Reversing, the SJC noted that the question for a fact-finder would ultimately be "whether the lender *should have recognized* at the outset that the plaintiffs were unlikely to be able to repay the loan." *Id.* (emphasis supplied). Remarking that "[t]he answer to this question is hardly a matter of undisputed material fact," the SJC went on to describe the kinds of evidence that would be germane to this determination, noting that "the record contains undisputed documentation that the lender artificially inflated [the borrower's] income to $5,900 per month . . . and that, while in possession of documents showing [the borrower's] monthly and annual income, the lender issued a loan with monthly payments exceeding the plaintiffs' total monthly income." *Id.* A test looking to whether the lender "should have recognized" (whether the standard of culpability is recklessness or something else) simply is not a standard in which a subjective belief by the lender is enough to prevent liability.

This objective, lender-focused approach has particular force given the acute dangers associated with low-diligence loans originated on the basis of income projections provided by a borrower that a bank does not verify or ignores. The First Circuit has held that even a borrower's submission of a loan application (and thus in a situation where the borrower will always "know more" than the lender) does not necessarily relieve the lender of liability.

*Frappier*, 645 F.3d at 57.   *Frappier* reinstated a case for the plaintiff, ruling that even the borrower's knowledge "hardly means that Countrywide *should not have recognized at the outset that Frappier was likely to default.*"   *Id.* (emphasis added).   The issuance of a "stated income" loan, the court noted, "may be an unfair or deceptive act if the lender used this vehicle to issue loans based on loan applications that it knew or should have known were false, and thereby in some fashion *encouraged or tolerated* the borrower's false representations."   *Id.* (quoting *H & R Block*, 2008 Mass. Super. LEXIS, at *29 (emphasis added)).

The bankruptcy court's failure to grapple with these precedents is manifest in the very last finding it made on wrongful origination.   It stated: "The Church understood these risks at least as well as the Bank did . . . . [i]n at least one important respect the Church's understanding was better than the Bank's."   Ex. 1 ¶ 238.   This is *exactly* the type of defense to a wrongful origination claim that *Drakopoulos* rejects.   A lender can always say "the borrower knew its income better than the bank."   The issue with Chapter 93A, Section 9 plaintiffs is that they are always striving, to own a home or otherwise.   A lender cannot make a loan to a Section 9 plaintiff like a homeowner or Charles Street based on collateral value alone; it must make a serious evaluation of the likelihood the payments will be made and the loan will not end in foreclosure.   *See Fremont*, 897 N.E.2d at 554–55.   The law in the Commonwealth is that Chapter 93A, Section 9 polices these situations, on the traditional 93A all facts and circumstances basis, and that a lender cannot ignore its knowledge and be blind to obvious facts.   That is a policy decision that the Attorney General of the Commonwealth made in first bringing the *Fremont* case, which was validated by the SJC in that decision.

Other cases and authority demonstrate that the test for liability is not of subjective intent, but level of culpability rooted in objective facts.   *See, e.g.*, *Moronta v. Nationstar Mortg., LLC*,

41 N.E.3d 311, 316 (Mass. App. Ct. 2015), *rev'd on other grounds* 64 N.E.3d 1287 (Mass. 2016) (lender "*should have recognized at the outset* that the borrower was unlikely to be able to repay" (emphasis added)); *Silva v. OneWest Bank, FSB*, No. 1001681, 2010 WL 2432046, at *3 (Mass. Super. May 19, 2010) ("[I]t is unfair to make a loan where the lender *does not reasonably believe* that the borrower will be able to repay . . . ." (emphasis added)); 14C Mass. Prac., Summary of Basic Law § 15.113 (4th ed.) (citing *Fremont* and stating that, under Massachusetts law, "[a] lender may not make a high cost home mortgage loan unless . . . *the lender reasonably believes that the obligor will be able to make the scheduled payment*s to repay the loan based upon a consideration of the obligor's current and expected income, current and expected obligations, employment status and other financial resources" (emphasis added)).

And thus the errors of the bankruptcy court made in focusing on the Bank's subjective intent rather than objective facts are apparent. For example, the bankruptcy court found that the lender knew that it would take "unprecedented" levels of charitable giving and income in order for the Church to complete the RRC and then make payments on the Construction Loan. Ex. 1 ¶ 81. The Bank took a letter from the Church regarding potential charitable giving pledges as its only diligence regarding fundraising, even when the letter did not say how much of the funds had already been raised. *Id.* ¶ 45. And, of course, the finding is clear that the Bank did zero diligence on the financial statements provided by the guarantor, something the bankruptcy court specifically commented was "remarkable." *Id.* ¶ 99.

Had the bankruptcy court set forth the framework plainly announced in *Fremont*, *Drakopoulos*, and *Frappier*, and then applied the correct legal standard, it would have reached a different outcome based on precisely the detailed factual findings that it made. Compounding the error is bankruptcy court's total dismissal of specific regulatory warnings to the Bank to

avoid *exactly* the kind of underwriting that occurred here as being of "no use in the task at hand," and "helpful only for its confirmation of findings that the Court would have made, on the basis of other evidence." *Id.* at 9 n.2; *see also* Ex. 10, 12 (FDIC Reports of Examination). It cannot be that bank regulators could warn a bank about certain problematic types of loans, and that such a bank could continue making such loans solely in reliance on the subjective belief that the loans will not fail.[4] That would turn *Fremont* on its head. Such evidence can only be omitted if the test is only one of pure, subjective intent. Whether a lender acts contrary to appropriate industry practice is directly relevant to the all-facts-and-circumstances inquiry called for by Chapter 93A.

Finally, the bankruptcy court's conclusion that the Bank "reasonably believed that the Church would be able to raise through its capital campaign any amounts that might be needed for these purposes" is simply unsupportable. Ex. 1 ¶ 229. This generalized conclusion of law (or mixed finding of law and fact) runs directly counter to specific findings in the Order regarding the Bank's knowledge during the underwriting process. For example, the bankruptcy court found that the Bank's debt service coverage analysis did not reflect the Church's need to raise additional funds to complete the RRC or that such supplemental fundraising would "put extra strain on the Church's membership and essentially compete with the Church's ordinary operating budget for membership donations." *Id.* ¶ 70. The bankruptcy court found specifically that this need for additional fundraising did not factor into the Bank's liquidity analysis. *Id.* ¶ 73. The bankruptcy court also found that the Bank's underwriter and senior loan officer understood that the Construction Loan relied heavily on rents and contributions that the underwriter called "unprecedented," and that no one at the Bank inquired into the soundness of the Church's

---

[4] Similarly, the Church put on an expert witness who testified at length that the 2006 regulatory guidance was "a big deal," Ex. 2 at 29:14, and the guidance "certainly wasn't followed" by OneUnited in underwriting and originating the Construction Loan by, for example, failing to ensure minimum borrower requirements were maintained, *id.* at 30:12-30:25.

fundraising projections.  *Id.* ¶ 81.  To say that the Bank could have "reasonably believed" that the Church could raise funds that the Bank itself called "unprecedented," especially where the Bank did no diligence or analysis to confirm the Church's ability to raise such funds, reflects yet another misunderstanding of this standard.

### B. The Bankruptcy Court Erred by Ignoring Principles of Causation Relevant to Chapter 93A Claims.

In addition to showing that the defendant committed an unfair or deceptive act, to prove a Chapter 93A claim the plaintiff must also show that the unfair or deceptive act caused harm to the plaintiff.  *See Casavant v. Norwegian Cruise Line Ltd.*, 952 N.E.2d 908, 912 (Mass. 2011) (Chapter 93A plaintiff must prove "a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception").  As with the question of whether the Bank's origination of the Construction Loan was wrongful, the Church is forced to reverse-engineer the bankruptcy court's application of causation principles: in more than a hundred pages, the bankruptcy court *does not cite a single case* discussing causation generally or Chapter 93A, nor does it explain the causation standard it presumably applied.

At the center of the bankruptcy court's decision is a ruling that certain post-origination events largely beyond the parties' control contributed to the Construction Loan's failure. Specifically, the bankruptcy court found that "[t]he loan ultimately failed for lack of sufficient funds to address construction contingencies when and as they arose," and that the lack of funds was the result of a "perfect storm" of events: (i) the emergence of new construction needs, (ii) insufficient fundraising by the Church, and (iii) the District's failure to rescue the Construction Loan.  Ex. 1 ¶¶ 231–35.  The bankruptcy court then stated that "OneUnited did not foresee or anticipate any of these three factors," and that "[t]he Church understood [the financial] risks at least as well as the Bank did."  *Id.* ¶¶ 236, 238.

23

As an initial matter, the bankruptcy court's causation test is fundamentally flawed for a simple reason: at the time the Construction Loan was originated, the loan's failure was foreseeable and, in all likelihood, inevitable.  That is, the loan's failure was caused primarily by the structure of the loan itself, not the subsequent events relied on by the bankruptcy court.

The loan's failure could hardly be a surprise given that it shared many of the same features as the loans deemed presumptively unfair in *Fremont*.  As has been discussed, the Church had insufficient cash flow to service the debt, particularly once the initial, prepaid interest period ended, and the guarantor did not have the financial wherewithal to bail out the loan.  *See supra* Part II.  Further, the value of the as-complete RRC was insufficient to justify the loan amount, a fact perhaps best evidenced by the loan-to-value ratio, which, despite calculating the value of the as-complete RRC using an outdated and inaccurate appraisal, was 96 percent. Ex. 1 ¶¶ 58, 84.

This loan structure left the Construction Loan with a high likelihood of failure.  The Church's lack of liquidity meant it would be dependent on "unprecedented" levels of fundraising and rental income in order to pay the loan.  *Id.* ¶ 81.  The Bank, however, only committed to loan the Church enough to obtain a Certificate of Occupancy, or about $2 million short of a complete, revenue-generating building.  *Id.* ¶¶ 33, 35.  And even if the Church met its fundraising goals, it would be unable to repay the loan without securing takeout financing because, as the Bank knew, the Church would be unable to generate rental income from the RRC until two years after construction was complete.  *Id.* ¶ 82.  In other words, to avoid failure, the Church would need to secure takeout financing, which the Bank did not commit to and which, in order to obtain, would require that the value of the RRC increased.

*Fremont* prohibits exactly this type of lending behavior because loans that are structurally unsound are likely to fail because of that structure.  Such loans force cash-strapped borrowers—once the introductory "honeymoon" period ends—to make debt service payments their income cannot support, leaving them with the choice to refinance (which may not be possible depending on the value of their property) or default.  *See Fremont*, 897 N.E.2d at 554–55.  A bank is not supposed to base a lending decision on hoped for increasing collateral value.  *See id.*  That was the Bank's thesis for making the Construction Loan, *see* Ex. 1 ¶¶ 83–86, and, predictably, the loan failed for precisely these reasons.  The inability of the borrower to raise funds and make payments is not an "intervening cause"—it is the gravamen of the wrongful origination.

Moreover, the bankruptcy court's focus on whether the Bank actually foresaw the causes of the loan's failure is severely misplaced; the correct test, informed by black letter tort law, is whether such causes were objectively foreseeable to reasonable people in the same shoes as the parties.  Chapter 93A requires "a causal connection between the [unfair act] and the loss," i.e., actual causation, and "that the loss was foreseeable as a result of the [unfair act]," i.e., proximate causation.  *Smith v. Jenkins*, 732 F.3d 51, 71 (1st Cir. 2013).  An intervening event can "compromise the chain of causation," *Ferreira v. Sterling Jewelers, Inc.*, 130 F. Supp. 3d 471, 484-85 (D. Mass. 2015), but the test is whether the causation was "unforeseeable" (an objective test), not whether it was "actually foreseen" (by a Bank that was blind in its underwriting process).[5]

Based on the facts as the bankruptcy court found them, the causes of the loan's failure were the natural and reasonably foreseeable consequences of the loan origination, and were baked into the risky, structurally unsound loan that the Bank offered.

---

[5] The Church seeks further guidance on this issue in its contemporaneously filed Motion to Certify.

First, while construction on the RRC experienced unexpected costs and delays, the bankruptcy court's "causation" ruling ignores its own findings that the Bank was well aware that the Church did not "have adequate cash flow to service th[e] debt" in the first place, whether at the qualifying or initial interest rate. Ex. 1 ¶ 58. The Church's debt service coverage ratio—a measure of the borrower's income net of other expenses (and, thus, available to service a debt) relative to the amount owed by the borrower in a given year—was below 1.00 at the time of origination, indicating that the Church's available cash flow was insufficient to support repayment of this loan. Ex. 1 ¶ 62. Though the Bank calculated a revised DSCR that leapt above 1.00, this calculation was erroneous and had "no justification." *Id.* ¶ 65. Moreover, the Bank's analysis did not factor in the need to raise money to complete the RRC. *Id.* ¶ 73. All of this was known to the Bank, and eminently foreseeable.

Second, though the Church's fundraising lagged behind its projections, that was also entirely foreseeable, and, in fact, was foreseen, by the Bank. As the bankruptcy court noted, the Church was able to raise roughly $1.5 million as part of its RRC campaign from the congregation through June 2005. *Id.* ¶ 10. In order to make interest payments and pay off the loan, the Church would need to raise another $2 million from the "same group of people." *Id.* ¶ 81. Not only did the Bank fail to recognize "the law of diminishing returns," it ignored its own underwriter, who warned the Bank's Chief Loan Officer during the origination process that the loan was "anchored on the receipt of *unprecedented* lease and rental income, gifts, grants and campaign contribution (sic)[.]" *Id.* ¶ 81. In other words, it was reasonably foreseeable that the Church's fundraising efforts would fall short, and, in fact, the Bank foresaw it. Further, the Bank was "well aware" that the Church would need to fundraise in order to address potential construction short falls, among other reasons. *Id.* ¶¶ 76–77.

There is a grim irony to the bankruptcy court's conclusion that the failure of the guarantor's intervention was unforeseeable.   Clearly, the loan was overly-dependent on the District and the hope that the District would be able to "rescue" the loan drove underwriting. Perhaps the Bank did not *actually* foresee it, but it was not for lack of opportunity.   The Bank "did not exercise the diligence that a reasonable person would have exercised in investigating the guarantor and its role in the Project."  *Id.* ¶ 102.  Indeed, during the loan application process, the District provided the Bank with its consolidated financial statements, *id.* ¶ 87, and "[t]he Bank's decision makers relied heavily on [them], but no one at the Bank undertook to verify them.   The Bank accepted them at face value.   In particular, the Bank made no inquiry into the authority of the bishop to move funds among member churches."  *Id.* ¶ 92.  The bankruptcy court found the Bank was willfully blind to the District's financial situation and then absolved it of liability in part on that basis.   Such reasoning defies logic.[6]

## CONCLUSION

Charles Street respectfully requests that this Court reverse the order below and enter judgment in its favor.   If it would be helpful to this Court's analysis, the Church urges the Court to grant its simultaneously filed Motion to Certify Questions to the SJC.

---

[6] The bankruptcy court also noted that the Church was at least as aware as the Bank regarding the risks involved.   Ex. 1 ¶ 238.  To the extent this factored into the bankruptcy court's analysis, that was error.   Indeed, if the causation standard boils down to the relative knowledge of the parties, there can *never be a claim* for wrongful loan origination because the borrower will almost *always* know more about its financial situation than the Bank.   Where, as here, there has been no suggestion the borrower acted in bad faith in applying for the loan, any reliance on the relative knowledge of the parties is misplaced.

Dated: Boston, Massachusetts
      February 2, 2017

Respectfully submitted,

CHARLES STREET AME

By its attorneys,

    */s/ D. Ross Martin*
D. Ross Martin (BBO No. 629853)
William L. Roberts (BBO No. 679735)
Joshua E. Goldstein (BBO No. 688250)
Patrick T. Roath (BBO No. 690603)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Tel:  (617) 951-7000
Fax: (617) 951-7050

E-mail:
    ross.martin@ropesgray.com
    william.roberts@ropesgray.com
    joshua.goldstein@ropesgray.com
    patrick.roath@ropesgray.com

Counsel to Debtor-Appellant Charles Street AME

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorneys of record for each other party electronically through the CM/ECF system.  In addition, the following party was served by mail:

John Fitzgerald
Office of Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Square, 10th Floor Suite 1000
Boston, MA 02109

Dated: February 2, 2017

_____/s/ D. Ross Martin_____
D. Ross Martin