UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTIONS NOS. 16-cv-12313-RGS, 16-cv-12314-RGS

IN RE CHARLES STREET AFRICAN METHODIST
EPISCOPAL CHURCH OF BOSTON

CHARLES STREET AFRICAN METHODIST
EPISCOPAL CHURCH OF BOSTON

v.

ONEUNITED BANK

MEMORANDUM AND ORDER ON
APPEAL FROM THE BANKRUPTCY COURT'S
RULING ON OBJECTION TO PROOF OF CLAIM

May 19, 2017

STEARNS, D.J.

This bankruptcy appeal arises from the failed effort of a venerable Boston church, the Charles Street African Methodist Episcopal Church, to develop a multi-service community center in Roxbury. In the bankruptcy proceeding, the Church objected to a claim by its lender for the project, OneUnited Bank, asserting that OneUnited had wrongfully originated the loan to the Church under the Massachusetts Consumer Protection Statute (Chapter 93A). The Bankruptcy Court overruled the objection after an extended bench trial, and the Church appeals. In light of an ambiguity in the

Bankruptcy Court's order, and deferring to that Court's factfinding capacity, the case will be remanded for further consideration.

BACKGROUND

Neither party contests the extensive factual findings made by the Bankruptcy Court, so the court will simply summarize them here. *See Charles St. African Methodist Episcopal Church of Bos. v. OneUnited Bank (In re Charles St. African Methodist Episcopal Church of Bos.)*, 2016 WL 7167910 (Bankr. D. Mass. Nov. 2, 2016).

The Church is a Boston institution. It traces its origins to the early 1800s, when a small group of free African-Americans began to worship communally in a private home on Beacon Hill. The congregation grew, eventually acquiring a full-time pastor and membership in the African Methodist Episcopal (A.M.E.) Church, as well as articles of incorporation from the Massachusetts Legislature. In 1939, the congregation relocated from its namesake sanctuary on Charles Street to the Grove Hall neighborhood of Roxbury. The Church is an active presence in the community and is one of the largest congregations in the First Episcopal District of the A.M.E. Church, the governing body for some 330 A.M.E. churches in the northeast United States.

In the late 1990s, the Church undertook to expand its community outreach by establishing the "Roxbury Renaissance Center" (RRC) to provide services for local residents. In April of 1999, the Church acquired a building near its sanctuary to carry out the plan. It financed the purchase with its own funds and with the proceeds of a loan from the First Episcopal District Economic Expansion and Development Group (FEDEEDG). The Church gave the FEDEEDG a mortgage on the newly acquired property.

The Church then launched a fundraising campaign to raise the money to pay for renovations to the building, collecting approximately $1.5 million as of 2005. Some of the funds raised went to preconstruction projects, including the commissioning of architectural plans and engineering studies. Based on this preliminary work, the Church projected a budget of roughly $4.7 million to fully renovate the RRC. In early 2005, the Church sought a $5 million loan to underwrite the budget, but was unsuccessful in locating an interested lender.

After these initial efforts failed, the Rev. Gregory Groover, the Church's pastor, met with an official from the City of Boston Department of Neighborhood Development, who suggested that the Church approach OneUnited Bank for a loan. OneUnited is the largest black-owned bank in the United States and has a long history of making loans to churches and

nonprofits in the black community. Fortuitously, when contacted by the Church, OneUnited had plans to open a retail branch in Grove Hall.

In April of 2005, OneUnited sent Rev. Groover a letter of interest. The letter included three pages of proposed terms, including requirements that the loan not exceed $3.2 million; that the Church contribute $800,000 toward a total budget of $4 million; that the First District fully and unconditionally guarantee the loan; and that OneUnited be granted a first and exclusive mortgage on the RRC property. Over the next year and a half, negotiations stayed more or less within the parameters set by OneUnited, although both sides understood that the anticipated loan would not pay for the full cost of the renovations.

The underwriting documents were signed by OneUnited on May 22, 2006, and the loan closed in October. The loan allocated $3.2 million for construction costs, $165,000 to address construction overages (subject to OneUnited's approval), and $187,000 to fund interest payments. The term of the loan was eighteen months, although the Church had the option of exercising two 90-day extensions should it encounter construction delays. The loan carried an initial 7.25% interest rate that over time floated with the prime rate (capped at 13.25%). The First District guaranteed the loan, which was also secured by mortgages on the RRC property and another church-

owned property in Roxbury. The loan also required either a voluntary subordination of the FEDEEDG's mortgage to OneUnited's, or a reduction in the construction budget sufficient for the Church to pay off the FEDEEDG mortgage. OneUnited promised to provide a take-out loan to pay off the construction loan and to amortize the debt over a longer term once the RRC received a certificate of occupancy.

The Bankruptcy Court found, and the parties do not contest, that OneUnited's decision to underwrite the loan on these terms was based on a review process that underappreciated weaknesses in the structure and premises of the loan.

OneUnited's underwriters at the outset accurately noted that the Church lacked the cash flow to service the loan at the qualifying or start rate. OneUnited's benchmark debt service coverage (DSC) ratio — the amount by which the debtor's net income could be expected to exceed the annual cost of servicing the debt — was 1.20, but an early draft of the underwriting documents pegged the DSC ratio for the Church at well below that mark at both the qualifying and start rates.[1] The shortfall, however, was larvated in

---

[1] Specifically, the March 7 draft of the underwriting memorandum examined the Church's finances for 2003, 2004, and 2005, and concluded that the DSC ratio for each year was .52, .82, and .74 at the qualifying rate and .65, 1.03, and .93 at the start rate, respectively.

later drafts by the exclusion of continuing payments that the Church was obligated to make on a separate outstanding loan, despite the fact that the Church would continue to service that loan together with the construction loan. The exclusion improved the DSC ratios substantially, but misleadingly.[2]

OneUnited also relied on the anticipated cash flow that would be generated by the RRC once it opened for business. The projections the Church provided to OneUnited, however, showed no rental income until the second year of occupancy, a fact that went unmentioned in OneUnited's underwriting documents. The impact of this oversight was compounded by the fact that rents were contingent on the Church's ability to raise a minimum of $1.3 million in the new phase of its fundraising campaign in order to complete the RRC renovations. OneUnited was aware of the symbiosis between fundraising and the eventual success of the RRC; it repeatedly emphasized the importance of the fundraising campaign in its discussions with the Church, and one of its underwriters observed that the long-term success of the loan depended "on the receipt of unprecedented lease and

---

[2] The May 1 draft of the underwriting memorandum calculated the DSC ratios as .93, 1.30, and 1.42 at the start rate for each year, and as .74, 1.03, and 1.13 for the qualifying rate. The final draft recalculated the start rate DSC ratios as .90, 1.25, and 1.37 for each year, in light of a shift in the start rate from 7% to 7.25%.

rental income, gifts, grants and campaign contribution[s]." *Charles St.*, 2016 WL 7167910, at *21. Despite this fact, "[n]o one at [OneUnited] inquired into the soundness of the [fundraising] projections." *Id.* These projections also distorted OneUnited's assessment of the Church's liquidity: OneUnited simply compared the Church's liquid assets with the monthly debt service on the proposed loan, without factoring in the Church's need to raise additional funds to finish the project.

Two other badges of success that OneUnited relied on also rested on shaky foundations. First, the underwriting documents emphasized the Church's deposit of an $850,000 "reserve" with OneUnited. The underwriters viewed the deposit as alleviating concerns about the Church's liquidity and ability to service the debt. In addition, the underwriters used the deposit to tamp down the "loan-to-value ratio" derived by dividing the loan amount by the appraised value of the collateral securing the loan. OneUnited's internal policy contemplated a maximum loan-to-value ratio of 75%, while the loan to the Church had a ratio of almost 96%. As an avoidance, the underwriters treated the $850,000 deposit as reserved collateral. This "reserve," however, consisted entirely of restricted funds that could not be used to cover obligations related to the loan or the RRC. OneUnited knew this to be true, both because Rev. Groover told it so, *Charles*

*St.*, 2016 WL 7167910, at *12, and because the terms of the deposit allowed it to be withdrawn by the Church in March of 2007, at least a year prior to the first payment on the loan. Thus, even were it not for the restriction, "the pledge of this deposit . . . served no true collateral purpose because it would disappear before [OneUnited] might need to have recourse to it." *Id.* at *22.

Second, OneUnited seriously misjudged the strength of the First District's guaranty. OneUnited reviewed two First District financial statements setting out its financial picture, which included its subsidiaries (like the FEDEEDG) and its 330 member churches. These statements looked robust: a consolidated net worth of $409 million and a $3.6 million excess cash flow as of late February of 2005. The statements also asserted that the Bishop of the First District had the "authority to transfer funds at his discretion between organizations and member churches." *Id.* at *23.

With this rosy scenario in mind, the underwriters relied on the First District's guaranty to ameliorate concerns about the DSC and loan-to-value ratios, as well as the Church's liquidity. "On the basis of the guaranty, [OneUnited] approved a loan that, but for the guaranty, it would not have approved." *Id.* OneUnited, however, never verified the First District's financial statements or took into account the District's responsibility for some 330 other member churches. Nor did OneUnited inquire about the

true extent of the Bishop's authority, including whether he had ever exercised his plenary power over the funds of member churches.

The Bankruptcy Court also found two additional factors that drove the decision to underwrite the loan. First, OneUnited believed that the RRC project was good for the community and that funding it "was consistent with [OneUnited]'s mission of economic and community development in Grove Hall and Roxbury." *Id.* at *25. Second, OneUnited felt "that the loan would establish a high-profile relationship that would create good will and thereby help [OneUnited] in its effort to open a branch in Grove Hall and to develop deposits and loans in the area." *Id.* The Court concluded that "[t]hese two factors gave [OneUnited] motivation to work with the Church to find a way to approve the Construction Loan if at all possible." *Id.*

In the end, the project failed. Construction proceeded much more slowly than expected and costs quickly rose, attributable in part to the need to repair structural flaws in the building. Although these had been identified by the preconstruction engineering surveys the Church had, the cost of correcting these flaws had been inexplicably omitted from the construction budget submitted by the Church to OneUnited. The Church's fundraising campaign proved unable to keep pace with the additional budgetary demands, much less the need to fund the necessary finishing work after

completion of the first phase of the project. The Church, as might be expected, exercised both of the 90-day extensions permitted under the loan, and then sought and received three loan modifications from OneUnited. These proved unavailing, and the loan went into default in December of 2009. The Church's contractor stopped work because of nonpayment, and the work never resumed. The First District did not step in to save the project.

Although negotiations between the Church and OneUnited continued, the relationship eventually soured. OneUnited brought suit in the Massachusetts Superior Court in September of 2010 against the Church and the First District, seeking repayment of the loan. The Church filed an answer and counterclaims, including a claim under Chapter 93A alleging that OneUnited had wrongfully originated the loan. The Superior Court dismissed that claim, but after an interlocutory appeal, a single justice of the Massachusetts Appeals Court reversed the dismissal and remanded the claim to the Superior Court.

Shortly thereafter, to stave off a foreclosure auction by OneUnited of Church properties securing a loan not at issue in this appeal, the Church filed for bankruptcy under Chapter 11. OneUnited filed a proof of claim in the bankruptcy action, asserting an outstanding balance due and owing on the loan of just over $3.8 million. The Church filed an objection to the proof of

claim, offering the Chapter 93A claim as a setoff reducing or eliminating the debt to OneUnited. After a bench trial, the Bankruptcy Court overruled the Church's objection.[3] This timely appeal followed. Alongside its brief on appeal, the Church filed a motion to certify two potentially dispositive questions of law to the Massachusetts Supreme Judicial Court. *See* Dkt #17.

## DISCUSSION

The Church bases its objection on Chapter 93A. Chapter 93A forbids "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). This prohibition has different dimensions depending on the identity of the parties to a transaction. In the consumer context, a person may sue to vindicate a harm caused by an unfair or deceptive act under Section 9 of Chapter 93A. If, however, both parties are "engage[d] in the conduct of any trade or commerce," *id.* § 11, then a stricter standard of liability applies, *see Giuffrida v. High Country Inv'r, Inc.*, 73 Mass. App. Ct. 225, 238 (2008). Nonprofit status does not automatically mean that a party is outside the scope of Section 11; instead, the court must examine the behavior of the parties and the nature of the

---

[3] The Church also filed, and the Bankruptcy Court also overruled, an objection and counterclaim alleging a Chapter 93A violation by OneUnited for unfair or deceptive use of the foreclosure process. The Church has not appealed that aspect of the Bankruptcy Court's decision.

transaction as a whole.  *See Linkage Corp. v. Trs. of Bos. Univ.*, 425 Mass. 1, 23-24 (1997).

The Church contends that a contextual examination demonstrates that its claim should be judged under the more forgiving standard of Section 9. The Church relies on recent Massachusetts cases applying Section 9 to residential mortgage lending practices.  These cases trace their roots to *Commonwealth v. Fremont Investment & Loan*, 452 Mass. 733 (2008), where the Supreme Judicial Court found actionable Section 9 unfairness in "the origination of a home mortgage loan that the lender should recognize at the outset the borrower is not likely to be able to repay."  *Id.* at 749.  The Court also identified four factors that make such loans presumptively unfair. *Id.* at 739.[4]  Subsequent decisions applying and interpreting *Fremont* have made clear that its holding is not bounded by any particular set of loan terms.

_____

[4] Specifically, the Court upheld a preliminary injunction bringing to a temporary halt foreclosures on mortgage loans with these characteristics: "(1) the loans were [adjustable rate mortgage] loans with an introductory rate period of three years or less; (2) they featured an introductory rate for the initial period that was at least three per cent below the fully indexed rate; (3) they were made to borrowers for whom the debt-to-income ratio would have exceeded fifty percent had Fremont measured the borrower's debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loan-to-value ratio was one hundred per cent, or the loan featured a substantial prepayment penalty . . . or a prepayment penalty that extended beyond the introductory rate period." *Fremont*, 452 Mass. at 739.

*See Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51, 56 (1st Cir. 2011); *Drakopoulos v. U.S. Bank Nat'l Ass'n*, 465 Mass. 775, 786 (2013).

The Bankruptcy Court did not decide whether Section 9 or Section 11 of Chapter 93A applied, nor did it discuss *Fremont*, *Drakopoulos*, or *Frappier*. Instead, the Bankruptcy Court assumed that Section 9 governed, and that the Supreme Judicial Court would, in an appropriate case, extend *Fremont* to lending transactions outside the home mortgage context. This court will likewise proceed on these assumptions. Although neither is self-evident under Massachusetts law, each assumption is a necessary predicate to the Church's case, as the Church has made no argument for Section 11 liability, nor has it identified a basis for a Section 9 unfairness claim other than *Fremont* and its progeny.[5]

On appeal, the Church argues that the Bankruptcy Court applied the wrong standard in evaluating its wrongful underwriting claim. This is a question of law that this court reviews *de novo*. *See In re Puffer*, 494 B.R. 1, 4 (D. Mass. 2013).

---

[5] In addition, the Church disclaimed before the Bankruptcy Court any theory that OneUnited's conduct was deceptive. It has not attempted to revive that theory here.

The Church asserts that *Fremont*-based wrongful underwriting claims are governed by an objective standard. This standard asks whether, from the perspective of a reasonable lender, OneUnited "should have recognized at the outset that the [Church was] unlikely to be able to repay the loan." *Drakopoulos*, 465 Mass. at 786. In this regard, the Church criticizes the Bankruptcy Court's findings about the subjective state of mind of OneUnited's decisionmakers. The Court, for example, found credible the testimony of OneUnited executives that "they believed the loan would succeed." *Charles St.*, 2016 WL 7167910, at *24. The Bankruptcy Court also concluded that although OneUnited "ignored its own standards" by failing to examine the First District's finances more closely, *id.*, it nonetheless "did truly believe that the [First] District was so financially strong and committed as to warrant the considerable faith that [OneUnited] placed in it," *id.* at *24-25. In the same vein, the Bankruptcy Court found that "when it approved the Construction Loan, [OneUnited] did not believe the loan would fail or was likely to fail." *Id.* at *25.

The Church's criticism of the Bankruptcy Court in this regard is both misplaced and unwarranted. The Bankruptcy Court made its findings about subjective state of mind because the Church's presentation at trial demanded it. The Church pursued two legal theories before the Bankruptcy Court. It

first argued that OneUnited was liable under Section 9 because it "made the Construction Loan with knowledge that the Church could not complete the Project and repay the loan and would inevitably default." *Charles St.*, 2016 WL 7167910, at \*53; *see, e.g.*, App. Vol. I, Ex. 3 at 95 (requesting liability findings that "there were two intertwined strands of knowing and willful imprudent underwriting" and that OneUnited's CEO engaged in "intentional and knowing" conduct); *id.* at 98 (requesting a finding that "[t]he evidence that [OneUnited] knew that the Church could not repay the Construction Loan . . . is overwhelming"); *id.* at 99 (requesting a finding that the OneUnited "knew or recklessly disregarded" facts showing that the loan would fail). This argument drew on language from the *Fremont* line of cases, which occasionally employ a "knew or should have known" formulation of the wrongful origination test. *Fremont*, 452 Mass. at 743; *accord Frappier*, 645 F.3d at 57. On appeal, the Church has abandoned that argument, preserving only its second theory of "reckless disregard."[6]

---

[6] At oral argument, the Church suggested that the Bankruptcy Court's findings on subjective knowledge reflected a mistaken evaluation of potential enhanced damages under Chapter 93A's "willful or knowing" standard at the liability stage. At best, this demonstrates that the inquiry into "knowing" conduct warranting enhanced damages may overlap with the inquiry into whether a lender makes a loan with knowledge that it will fail. It does not change the fact that the Church tried the case on both the knowledge and reckless disregard theories, and its own requested findings of fact at trial did

The Church is on more solid footing in noting that the Bankruptcy Court was less than fulsome in explaining how its factual findings interacted with the reckless disregard standard. The Court acknowledged at one point the Church's argument that "if [OneUnited] did not know that the loan was so doomed to fail, this fact was evident and [OneUnited] recklessly disregarded it." *Charles St.*, 2016 WL 7167910, at *53. Yet it adverted to the objective reasonableness of OneUnited's actions only twice in passing. First, it found that OneUnited was negligent — that it "did not exercise the diligence that a reasonable person would have exercised in investigating the guarantor and its role in the Project (among other things)" — but then found that OneUnited "was not unreasonable" in believing that the loan would succeed. *Id.* at *25. Second, the Court held that "[w]hen it made the loan, [OneUnited] did not know the loan would fail, nor was it evident that the loan would fail." *Id.* at *54.

The Church argues on appeal that the Bankruptcy Court's factual findings compel the conclusion that it prevailed at trial under *Fremont* on a reckless disregard theory, and requests that this court enter judgment in its favor. The court declines to do so without first giving the Bankruptcy Court

---

not make the distinction between liability and enhanced damages it offered here at oral argument.

the opportunity to explain its view of the relationship between its factual findings and the *Fremont* reckless disregard standard. Cases reviewing post-trial *Fremont* claims are extremely rare, and the standard remains relatively undeveloped.[7] The court offers the following observations to assist the Bankruptcy Court on remand.

Under Massachusetts law, "[a] ruling that conduct violates [Chapter] 93A is a legal, not a factual, determination." *Klairmont v. Gainsboro Rest., Inc.*, 465 Mass. 165, 171 (2013), quoting *Casavant v. Norwegian Cruise Line Ltd.*, 460 Mass. 500, 503 (2011). *Fremont* and its successor cases establish that Chapter 93A prohibits "the origination of a home mortgage loan that the lender should recognize at the outset that the borrower is not likely to be able to repay." *Drakopoulos*, 465 Mass. at 786, quoting *Fremont*, 452 Mass. at 749. Loans of this sort fall within the penumbra of the concept of unfairness established in the Massachusetts Predatory Home Loan Practices Act because of their fundamentally predatory nature. *See Fremont*, 452 Mass. at 748-749.

_____

[7] The court is aware of no published Massachusetts opinion reviewing a *Fremont*-based Chapter 93A claim post-trial. *See Forbes v. Countrywide Home Loans, Inc.*, 87 Mass. App. Ct. 1122, 2015 WL 2365497 (May 19, 2015) (unpublished table decision); *Costello v. Sovereign Bank, FSB*, 83 Mass. App. Ct. 1116, 2013 WL 791447 (Mar. 5, 2013) (unpublished table decision).

The question of what it means for a lender to make a loan which it "should recognize at the outset" is likely to fail is answered by reference to background principles of Chapter 93A law. "Chapter 93A usually requires a level of fault going beyond mere negligence."[8] *Frappier*, 645 F.3d at 59; *see, e.g.*, *Darviris v. Petros*, 442 Mass. 274, 278 (2004) ("[A] violation of Ch. 93A requires, at the very least, more than a finding of mere negligence . . . ."). *Fremont* and *Drakopoulos* evince no departure from this background principle, and the Church adopted it at trial. *See* App. Vol. I, Ex. 3 at 99 (requesting a finding that "the Construction Loan was doomed to fail [and] the Bank knew or recklessly disregarded that fact."); *accord id.* at 119. Although the Massachusetts courts have not defined recklessness in the Chapter 93A context, it suffices for these purposes to emphasize that reckless conduct embodies a "substantially greater" degree of culpability than mere negligence. *Boyd v. Nat'l R.R. Passenger Corp.*, 446 Mass. 540, 546 (2006), quoting Restatement (Second) of Torts, § 500.

Although *Fremont* and its progeny establish that reckless conduct can, as a matter of law, violate Chapter 93A, "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact." *Klairmont*,

---

[8] The chief exception to this principle is cases involving misrepresentations. S*ee, e.g.*, *DeWolfe v. Hingham Centre Ltd.*, 464 Mass. 795, 799 n.9 (2013).

465 Mass. at 171, quoting *Casavant*, 460 Mass. at 503. Even receiving a loan with the four "presumptively unfair" characteristics present in *Fremont* does not relieve a borrower of the obligation to prove that the loan was unfair or deceptive in the specific circumstances in which it was made. *Fremont*, 452 Mass. 740-741, 752. Similarly, *Drakopoulos* emphasized that "a determination whether the lender acted unfairly . . . when originating the plaintiff['s] loan is properly left to the finder of fact." 465 Mass. at 787; *accord Moronta v. Nationstar Mortg., LLC*, 88 Mass. App. Ct. 621, 629-630 (2015). This factual inquiry is made with reference to "the circumstances of each case." *Klairmont*, 465 Mass. at 174, quoting *Kattar v. Demoulas*, 433 Mass. 1, 14 (2000).

The importance of these principles is underscored by the Church's assertion on appeal that the Bankruptcy Court erroneously relied on its finding that, at the time the loan was made, the Church knew more about the struggles of its fundraising campaign than OneUnited did. *Charles St.*, 2016 WL 7167910, at *50. The Church argues that consideration of this factor — that, in the Church's words, "the borrower knew its income better than the bank," Mem. at 20 — is forbidden under the *Fremont* line of cases. In *Frappier*, for example, the First Circuit reversed a grant of summary judgment to a lender where the plaintiff had signed loan documents attesting

to a higher income than he actually earned, 645 F.3d at 57, while in *Drakopoulos*, the plaintiffs staved off summary judgment despite the fact that they had signed loan documents listing an income roughly three times higher than their actual monthly income, 465 Mass. at 778.

The Church's argument ignores the post-trial posture of this case. All the prior reported cases applying the *Fremont* standard ask whether there are grounds for a preliminary injunction (as in *Fremont* itself) or reverse a grant of summary judgment to a lending institution (as in *Frappier*, *Drakopoulos*, and *Moronta*). These cases thus recognize that whether the lender's conduct was unfair under the circumstances is a question of fact. Here, where a trial has taken place, the factfinder is permitted to take into account the borrower's representations to the lender as part of the mosaic of facts in determining whether this particular loan was unfair. *See Klairmont*, 465 Mass. at 174. In the specific context of fundraising, the Bankruptcy Court may consider the Church's one-sided knowledge of its underperforming but crucial fundraising campaign, created in part by the incomplete answer it gave when OneUnited inquired about the progress of

that campaign, *Charles St.*, 2016 WL 7167910, at *21 — just as it may consider OneUnited's failure to further delve into the details.[9]

Finally, this court is well aware that the Bankruptcy Court has been handling the Church's bankruptcy proceeding for over five years, and this adversary proceeding for nearly three. The court therefore emphasizes the limited nature of the task on remand. The Church has not appealed the Bankruptcy Court's decision on the wrongful foreclosure claim, nor has it contested any of the factual findings. It has also chosen not to contest the Bankruptcy Court's rejection of the theory that OneUnited made the loan

---

[9] This approach accords with decisions by the current Chief Justice of the Supreme Judicial Court in the residential mortgage context. While serving as a Justice of the Superior Court, he rejected the suggestion that "stated income" loans are inherently unfair, as they "are no more prone to foreclosure than full documentation loans if the statements in the application are accurate." *Commonwealth v. Fremont Inv. & Loan*, 2008 WL 517279, at *11 (Mass. Super. Ct. Feb. 26, 2008) (Gants, J.); *see Commonwealth v. H&R Block, Inc.*, 2008 Mass. Super. LEXIS 427, at *27-29 (Nov. 28, 2008) (Gants, J.); *see also Forbes*, 87 Mass. App. Ct. 1122, 2015 WL 2365497, at *2 (holding that "the judge reasonably concluded that, because 'Forbes chose to state, and to continually verify his [false] income information, [ ] Countrywide was entitled to rely on it [in determining the debt-to-income ratio and otherwise]'"); *id.* at *1 & n.5 (observing that the plaintiff inflated his income based on an unreasonable projection of possible rental income). Notably, now-Chief Justice Gants viewed the facts and circumstances relevant to a finding of unfairness as focused on the lender, holding that "the issuance of [a loan which will likely not be repaid] is deemed to be unfair under Chapter 93A even if the lender provides fair and complete disclosure of the terms of the loan and the borrower is fully informed of the risks he faces in accepting the loan." *Fremont*, 2008 WL 517279, at *9.

with knowledge that it would fail.  Thus, on remand, the Bankruptcy Court need only apply the standard articulated above to determine whether OneUnited acted unfairly by making this loan with reckless disregard for facts which made it likely that the loan would fail.  It can do so, in part, by clarifying the relationship between its detailed historical findings and the reckless disregard standard.  As its methodical findings in the initial order demonstrate, the Bankruptcy Court is also fully equipped to make any additional factual findings it deems necessary.[10]  *Cf. Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 467-468 (2013) (remanding where ambiguity existed in trial court's analysis in a Chapter 93A case).  This court expresses no view on the merits of the Church's claim.

### ORDER

For the foregoing reasons, the Church's motion to certify questions to the Massachusetts Supreme Judicial Court (Dkt #17) is <u>DENIED</u>.  The Bankruptcy Court's order overruling the Church's objection to OneUnited's

---

[10] If the Bankruptcy Court concludes that the Church has made out a claim under the reckless disregard theory, it may also need to make additional factual findings in addressing the first of the assumptions on which this appeal rests: that the Church was acting under Section 9, rather than Section 11, when it took out the loan.  The Bankruptcy Court would also no longer be able to assume, without deciding, that the Supreme Judicial Court would extend the rule of *Fremont* beyond the residential mortgage context.

proof of claim is <u>VACATED IN PART</u>, and the case is <u>REMANDED</u> for further proceedings consistent with this opinion.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE